## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 24 2019, 9:18 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Valerie K. Boots
Ellen M. O'Connor
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Sierra A. Murray
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kelly M. Hudson, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | September 24, 2019 <br><br> Court of Appeals Case No. 19A-CR-197 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Kurt Eisgruber, Judge <br><br> Trial Court Cause No. 49G01-1712-MR-46906 |

**Kirsch, Judge.**

[1] Kelly M. Hudson ("Hudson") was convicted after a jury trial of murder,[1] a felony. He appeals his conviction and raises the following restated issue for our review: whether the State violated the Fifth Amendment or Article 1, Section 14 of the Indiana Constitution because it improperly referred to Hudson's constitutional right to remain silent.

[2] We affirm.

## Facts and Procedural History

[3] In the fall of 2017, Catherine Dunaway ("Dunaway"), who went by the nickname Cat, lived in a studio apartment on Meridian Street in Marion County, Indiana. *Tr. Vol. II* at 28, 141. She had a brother, David Dunaway ("David"), with whom she had a close relationship. *Id*. at 28. Dunaway struggled with drug and alcohol issues, and David was aware that she smoked crack. *Id*. at 29-30. On October 31, 2017, Dunaway was getting ready to move down the street into a new apartment building, and David brought her a roll of black trash bags to use for packing her clothes. *Id*. at 28-29, 36. Dunaway was scheduled to move into her new apartment two days later on November 2, 2017. *Id*. at 28-30, 39.

[4] Sandra Johnson ("Johnson") was neighbors with Dunaway and lived in the same apartment building. *Id*. at 140. On Tuesday, October 31, 2017, Johnson

---

[1] *See* Ind. Code § 35-42-1-1.

was walking down the street when Hudson, whom she had met on a previous occasion, approached her. *Id*. at 143-44. Hudson had been riding on a bus on Meridian Street when he saw Johnson, so he jumped off the bus and met up with her. *Id*. at 143. The two walked to Johnson's apartment building where they smoked crack together. *Id*. at 147-48. Afterwards, Hudson asked Johnson if she knew "anybody to introduce him to." *Id*. at 148. Johnson said yes and introduced him to Dunaway. *Id*. at 148-49. Hudson ended up staying at Dunaway's apartment all night. *Id*. at 150.

[5] On the next day, November 1, 2017, Johnson was doing laundry when she saw Hudson ringing the doorbell to get into the building at around 7:00 or 8:00 p.m. *Id*. at 150-51. Dunaway let him inside, and she and Hudson went upstairs to her apartment. *Id*. at 151-52. At some point later, Hudson came downstairs to Johnson's apartment and told her that while he was in the shower, Dunaway had stolen some of his crack. *Id*. at 155. He said that he "was going to hit her," but Johnson "didn't think nothing of it." *Id*. at 156.

[6] Around 9:00 or 10:00 p.m., Johnson went upstairs "to see what [Hudson and Dunaway were] doing." *Id*. at 152. Hudson asked Johnson for some laundry detergent in exchange for "a little piece of crack." *Id*. at 153, 163. Johnson put some detergent in a cup that Hudson had gotten from inside of Dunaway's apartment, and Hudson gave her the crack. *Id*. Johnson then returned to her apartment. *Id*. at 154. She saw Dunaway for the last time at around 12:00 or 1:00 a.m. that night when Johnson went back to Dunaway's apartment "[j]ust to check on them to see what they [were] doing." *Id*. When Dunaway

answered the door, she asked Johnson for a cigarette. *Id*. at 155, 168. Johnson went back downstairs and never saw Dunaway or Hudson again. *Id*. at 154-56.

[7] The next morning, November 2, 2017, Dunaway did not move into her new apartment as scheduled. *Id*. at 39. Theresa Wyatt ("Wyatt"), who managed the new apartment building where Dunaway was supposed to move, was a close friend with Dunaway and also shared a son with Dunaway's brother, David. *Id*. at 30, 38. When Dunaway failed to move into the new apartment building that day, Wyatt called her, and someone with a "deeper voice" answered the phone and said they would call Wyatt back. *Id*. at 39, 43-45. Wyatt did not believe that the voice sounded like Dunaway, but thought that maybe her voice sounded deeper because Dunaway was just waking up. *Id*. at 44-45.

[8] By November 3, 2017, neither David nor Wyatt had heard from Dunaway for a couple of days. *Id*. at 30, 39-40. The two of them went to her old apartment, but she did not answer the door when they knocked. *Id*. at 40. They were able to obtain a key to the apartment from the manager to conduct a wellness check. *Id*. at 31, 40. Once inside the apartment, they noticed that nothing was packed for Dunaway's move to the new apartment. *Id*. at 31. Dunaway's shoes were by the door, and her purse was on the stove. *Id*. at 40-41, 201. A large pile of clothing was on the floor in the living room. *Id*. at 31, 40-41, 201. After checking the rest of the apartment, David walked over to the pile and picked up some of the clothing. *Id*. at 31, 42. Dunaway's dead body was hidden

underneath, face down with a stab wound to her neck. *Id*. at 31-32, 201; *Tr. Vol. III* at 57.

[9] In their investigation of the apartment, the police found twenty-one of Hudson's fingerprints inside of Dunaway's apartment. *Tr. Vol. II* at 116-17. His fingerprints were found on several black garbage bags inside the apartment, including one that contained a bloody pillow. *Id*. at 114-16, 207. It appeared as though the garbage bags had contained clothing that was dumped onto Dunaway's body. *Id*. at 201-03. Hudson's fingerprints were also found on an ashtray that was located on top of a blanket that had been used to cover a chair covered with blood stains, which was likely the place where Dunaway was stabbed. *Id*. at 116, 209-10, 215. It appeared that Dunaway's body had been dragged from the chair to where her body was located on the floor. *Id*. at 88. Male DNA was discovered on Dunaway's left wrist. *Id*. at 184-85.

[10] On December 1, 2017, the police brought Hudson into the homicide office for questioning. *Id*. at 217. During the interview, which was recorded, Hudson denied knowing anything about the murder. *State's Ex*. 108. Initially, he denied ever meeting Dunaway, but he later changed his story and said he met another woman but did not know her name. *Id*. The detective interviewing Hudson told him the other woman's name was "Catherine," and Hudson later admitted that he went back to see "Cat." *Id*. However, he denied ever being inside of Dunaway's apartment. *Id*.

[11]     On December 4, 2017, the State charged Hudson with murder. *Appellant's App. Vol. II* at 23, 32-34. At the jury trial, Hudson did not testify, but his recorded interview with police was admitted into evidence. *Tr. Vol. II* at 220-21. During closing argument, defense counsel contended that there were innocent explanations for Hudson's fingerprints being inside of Dunaway's apartment. *Tr. Vol. III* at 80-81. As an explanation as to why Hudson's fingerprints were on the trash bags, defense counsel stated that testimony established that Dunaway was moving, and "[i]t is entirely reasonable that [Hudson] was helping her with that." *Id*. at 80. To explain why Hudson had lied to the police about being inside Dunaway's apartment, defense counsel stated, "We talked in voir dire about reasons that people might not be truthful with the police, . . . and one suggestion was being afraid, because who wouldn't [be] if you're being investigated for [murder]?" *Id*. at 86. In its rebuttal argument, the State remarked on the lack of evidence to support these defense theories. *Id*. at 89. The prosecutor stated,

> Your verdict and your decision is [sic] not to be based on speculation. And I want to talk about some things that were talked about in the defense closing that I have evidence that disproves, and I do want to talk about that, because we talked this morning, or yesterday morning, about your job as a juror, and your job as a juror is to put all of this together, and I want to talk about some specifics here. The Defendant was helping her move, and that's an innocent explanation for why his fingerprints are on there? You have no evidence from this stand. You have . . . no evidence here. . . . That's speculation.

*Id.* Hudson objected to these statements by the prosecutor, and the trial court overruled the objection. The prosecutor additionally stated,

> You can look to the lack of evidence. You can look at things that might not be there, but you can't speculate intent. The defense said an awful lot he was afraid when he talked to the police. You have no evidence of that. You heard Detective Dunn. You heard Detective Dunn, that statement say, "I want to make sure that I get what's going on here. Hey, I'm trying to be reasonable with you. I'm trying to be understanding." He was not yelling at the Defendant. He was not aggressive with him. The Defendant didn't say "I'm scared" in that statement. You have absolutely no evidence that that man was scared. It sounds good, but you have no evidence of it, and that's the speculation that I am talking about.

*Id.* at 90-91. The jury found Hudson guilty of murder. Hudson now appeals.

# Discussion and Decision

[12] The Fifth Amendment to the United States Constitution prohibits the State from commenting on a defendant's failure to testify in his own defense. *Feyka v. State*, 972 N.E.2d 387, 389 (Ind. Ct. App. 2012), *trans. denied*. Article 1, section 14, of the Indiana Constitution also protects a defendant's right to remain silent at trial. *Boatright v. State*, 759 N.E.2d 1038, 1043 (Ind. 2001). A defendant's privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that a jury could reasonably interpret as an invitation to draw an adverse inference from a defendant's silence. *Huls v. State*, 971 N.E.2d 739, 744 (Ind. Ct. App. 2012), *trans. denied*. However, if the prosecutor's comment in its totality addresses other evidence, and not the

defendant's failure to testify, it is not grounds for reversal. *Feyka*, 972 N.E.2d at 389. "The prosecutor may, for example, comment that the State's evidence is uncontradicted without violating the defendant's Fifth Amendment rights." *Id*. If a prosecutor's statement is found to be improper, "we must presume that reversal is necessary until the State proves beyond a reasonable doubt that any error was harmless." *Moore v. State*, 669 N.E.2d 733, 736 (Ind. 1996) (citing *Chapman v. California,* 386 U.S. 18, 23 (1967)). The question then is whether the jury would have found the defendant guilty without the improper remark. *Id*.

[13] Hudson argues that statements made by the State in its rebuttal argument violated his constitutional rights because the statements improperly remarked on his failure to testify at trial. He specifically asserts that the statement, "You have no evidence from this stand" "could reasonably have been an invitation to draw an adverse inference from his failure to testify." *Appellant's Br*. at 11. Hudson contends that the State's remarks were an attempt to impeach his lack of testimony and invited the jury to infer guilt from his silence at trial. He further contends that the statements were not harmless.

[14] During closing argument, defense counsel argued that there were innocent explanations as to why Hudson's fingerprints were found in Dunaway's apartment, specifically that his fingerprints were on trash bags because "[i]t is entirely reasonable that [Hudson] was helping her with [moving]." *Tr. Vol. III* at 80. In rebuttal argument, the State responded to this argument by remarking on the lack of evidence to support it and specifically stated,

> Your verdict and your decision is [sic] not to be based on speculation. And I want to talk about some things that were talked about in the defense closing that I have evidence that disproves, and . . . your job as a juror is to put all of this together, and I want to talk about some specifics here. The Defendant was helping her move, and that's an innocent explanation for why his fingerprints are on there? You have no evidence from this stand. You have . . . no evidence here . . . That's speculation.

*Id*. at 89.

[15] Hudson specifically takes issue with the State's remark, "You have no evidence from this stand" and argues that it was an improper comment on his failure to testify at trial. However, the statement by the prosecutor did not make any specific mention of Hudson and his failure to testify. Instead, it was a remark on the lack of any evidence presented to support the defense theory to explain why Hudson's fingerprints were present in Dunaway's apartment, that Hudson was helping Dunaway pack her things to move. The prosecutor may comment on the uncontradicted nature of the State's evidence without violating the Fifth Amendment. *Owens v. State*, 937 N.E.2d 880, 893 (Ind. Ct. App. 2010), *trans. denied*. The evidence presented by the State showed that Hudson had been inside of Dunaway's apartment and had lied to the police about it. *State's Exs.* 77, 108. No evidence was presented by Hudson to contradict that he had been present in Dunaway's apartment, only the defense counsel's argument in closing that there could have been a reasonable, innocent explanation why his fingerprints were on the trash bags. The State's comment did not focus on

Hudson's failure to testify; it was merely a remark on the lack of any evidence to support the defense theory presented in closing argument.

[16] Defense counsel also proffered an explanation as to why Hudson lied to the police about being inside of Dunaway's apartment. Counsel stated, "We talked in voir dire about reasons that people might not be truthful with the police, . . . and one suggestion was being afraid, because who wouldn't [be] if you're being investigated for [murder]?" *Tr. Vol. III* at 86. In response, the State commented in rebuttal,

> You can look to the lack of evidence. You can look at things that might not be there, but you can't speculate intent. The defense said an awful lot he was afraid when he talked to the police. You have no evidence of that . . . . The Defendant didn't say "I'm scared" in that statement. You have absolutely no evidence that that man was scared. It sounds good, but you have no evidence of it, and that's the speculation that I am talking about.

*Id*. at 90-91. This comment by the State again was a statement concerning the lack of evidence presented to support the defense theory. When looking at the State's comments in their totality, we conclude that the State's remarks were focused on the lack of any evidence to support the defense theory and to contradict the State's evidence, and, thus, the statements were not an inappropriate comment on Hudson's failure to testify.

[17] Affirmed.

Baker, J., and Crone, J., concur.